**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY MCMULLEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TROY HAMILTON, GARY S. JACOB, and GARY G. GEMIGNANI,<br><br>Defendants. | Case No.: 19-cv-825<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gary McMullen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges as follows based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters, based on the investigation conducted by and through his attorneys, which included, among other things, review of U.S. Securities and Exchange Commission ("SEC") filings by Synergy Pharmaceuticals Inc., ("Synergy" or the "Company"); conference call transcripts, media and analyst reports about the Company; and other public statements, filings and press releases by or about Synergy. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired securities of Synergy between September 7, 2017 through October 25, 2018, inclusive (the "Class Period"), brought against Troy Hamilton ("Hamilton"), Gary G. Gemignani ("Gemignani") and Gary S. Jacob ("Jacob") (collectively, "Defendants") for the dissemination of

materially false and misleading statements and omissions and concealment of material adverse facts in violation of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Prior to the Class Period, on September 5, 2017, Synergy entered into a $300 million senior secured loan from CRG Partners III L.P. ("CRG" and the "CRG Loan"), which in its initial incarnation provided an immediate cash infusion of $100 million with a second $100 million tranche of financing less than six months later, on or before February 28, 2018 and a third tranche of up to $100 million in the following thirteen months.

3. Then, with the start of the Class Period, on September 7, 2017, the Company began to deceive the market by elaborating on the potential for its lead product – TRULANCE - and the positive indicators in its launch to the marketplace. TRULANCE is a drug for the once-daily treatment of chronic idiopathic constipation ("CIC"). The Company described TRULANCE as a "high value asset" backed by the "right strategy and the right team." Defendants also portrayed the CRG Loan as a coup, providing the Company "with access to additional capital if and when" Synergy would need it.

4. As disappointing results trickled in and the Company struggled to meet the covenants of the CRG Loan, Defendants continued to assure the market that: (i) the Company was well-positioned for a revenue windfall from TRULANCE; (ii) Synergy could comply with the terms of the CRG Loan and would be able to gain access to needed capital; and (iii) if the Company was threatened with noncompliance, the Company's partnership and relationship with CRG was both strong and flexible enough to yield a favorable compromise.

5. Indeed, Defendants were so steadfast in their representations regarding TRULANCE's potential and the Company's future outlook that they initiated a strategic review because the marketplace was vastly undervaluing Synergy. However, in reality, Defendants were hoping for a white knight acquirer or a financing partner to save the Company from noncompliance with the covenants of the CRG Loan because of TRULANCE's disappointing results and the Company's failure to cash-in on the product's potential. All the while,

Defendants either misleadingly affirmed that the Company was expected to meet or exceed the covenants' requirements, or failed to disclose to the market the reality: TRULANCE had underachieved and the Company was burdened with covenants that it could not satisfy.

6. Finally, on October 25, 2018, the Company shocked its investors and the market by revealing that: (i) TRULANCE had substantially disappointed and that its launch and integration into the marketplace was not as successful as represented; (ii) as a result, the Company faced substantial risk that it would not be able to satisfy the minimum revenue, market capitalization and liquidity requirements in the CRG Loan; (iii) Synergy's efforts to renegotiate the terms of the CRG Loan had proven unsuccessful; and (iv) the strategic review process had failed to yield a "white knight" or financing alternative and was unlikely to do so prior to default on the Company's covenants to CRG.

7. Based on this stunning news, the price of Synergy common stock declined from $1.40 per share down to $0.43 per share, damaging the Company's investors.

## JURISDICTION AND VENUE

8. Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

9. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because Synergy is headquartered in New York City and some of the acts and practices complained of herein occurred in substantial part within this District.

10. In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

11. Plaintiff Gary McMullen purchased Synergy securities during the Class Period at artificially inflated prices as set forth in the certification annexed hereto.

12. Defendant Hamilton was appointed as the Company's Chief Executive Officer ("CEO") on December 19, 2017, after previously serving as Executive Vice President and Chief Commercial Officer. Defendant Hamilton also serves on the Company's Board of Directors. During the Class Period, Defendant Hamilton certified in the Company's quarterly filings to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

13. Defendant Gemignani is the Company's Executive Vice President and Chief Financial Officer. During the Class Period, Defendant Gemignani certified in the Company's quarterly filings to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

14. Defendant Jacob was the Company's CEO until December 19, 2017 after serving approximately nine years in that position and assumed the position of Executive Chairman through October 31, 2018.

15. Defendants Hamilton, Gemignani, and Jacob are together referred to herein as the "Defendants."

16. Each of the Defendants: (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; (d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) was aware of or recklessly disregarded the fact that false and misleading statements

were being issued concerning the Company; and/or (g) approved or ratified these statements in violation of the federal securities laws.

## RELEVANT NON-PARTY

17. Synergy is incorporated under the laws of the State of Delaware with its headquarters located at 420 Lexington Avenue, Suite 2012, New York, NY 10170. Synergy is a biopharmaceutical company focused on the development and commercialization of therapies to treat Gastro-Intestinal disorders and diseases. Synergy has over 248 million shares of common stock outstanding that are traded on the NASDAQ Global Select Market under the symbol "SGYP." The Company filed for Chapter 11 bankruptcy on December 12, 2018.

## SUBSTANTIVE ALLEGATIONS

18. Synergy is a biopharmaceutical company, which has only one FDA-approved commercial product, TRULANCE. Approved by the FDA on January 19, 2017, TRULANCE became available for purchase at the end of the first quarter of 2017. Synergy, by and through its management including Defendants, opted to position itself as a go-it-alone developer, and seller of its own product retaining third party contract manufacturers and approximately 250 sales representatives and foregoing potential licensing partnerships for the manufacture or distribution of TRULANCE. In choosing this path, Synergy sought to retain all profits generated by TRULANCE even though there would be significant initial costs and the Company's timeline for achieving profitability would be pushed back.

19. In order to execute this strategy, Synergy needed to fund its operations through equity offerings and loans. Thus, on September 5, 2017, the Company announced that it closed on a $300 million senior secure loan from CRG, which provided an immediate infusion of $100 million with a second $100 million tranche of financing less than six months later, on or before February 28, 2018, and a third tranche of up to $100 million in the following thirteen months. The CRG Loan required that Synergy: (i) comply with a minimum market capitalization covenant; (ii) maintain its listing on a national securities exchange; (iii) comply with a daily

minimum liquidity covenant; and (iv) maintain an annual revenue requirement based on the sales of TRULANCE.

20. At the time, Defendant Gemignani represented that the CRG Loan was "non-dilutive" and provided the Company "with access to capital for support of our commercialization of TRULANCE and funds our current plans for the Company through 2019 when, based on our current assumptions, we expect to be cash flow breakeven." In connection with the CRG Loan, Defendant Jacob stated that Synergy would have "access to additional capital if and when we need it." Thus, Defendants had represented that Synergy was supported by ample debt financing to keep its operations running through 2019.

21. On September 7, 2017, the Company held a Business Update call whereby Defendant Jacob stated that management was "very encouraged by a number of positive early launch signals" and "[e]xcited about the significant progress we have made in growing our market share in CIC." Further, Defendant Jacob discussed the Company's "plan to continue to execute on our commercial strategy to drive further growth and ensure the long-term success of TRULANCE."

22. Additionally, during the September 7, 2017, Business Update call, Defendant Gemignani stated that "we are confident in our ability to meet all of the performance milestones stated under the terms of the agreement, and we will have access to additional capital if and when we need it." Defendant Gemignani also represented that "[i]n TRULANCE, we have a high value asset in a large and growing market, supported by a strong and highly experienced commercial team."

23. On the call, Defendant Hamilton stated that the goal "from a commercial launch perspective has always been to optimize and maximize the value of TRULANCE, with the ultimate objective of providing adult patients with CIC an effective treatment option. This is done by first setting up TRULANCE for launch success and then executing the plan. And that is what we've done so far." Defendant Hamilton elaborated further, as provided below:

> It's been a little more than five months since launch, but early prescriber data and patient feedback is promising and very encouraging. And to date, we have met or exceeded our objectives around all key performance or prescription metrics and also in other areas like sales force related call plan activities and specific marketing-related initiatives, and you'll hear more about these metrics and activities a little later.
>
> Starting at a high level, we believe Synergy and TRULANCE are very well positioned for success and future growth, because we're in the right market, have the right product, the right strategy and the right team as demonstrated by our early launch success. The CIC market is the right market to be in. It is a large, growing market with the significant opportunity for continued growth in the future. And the unmet needs of CIC patients have created an opportunity for other options.
>
> TRULANCE is a strong treatment option with the right product profile, the pharmacology, efficacy, safety/tolerability and dosing. Those four pillars make up the foundation to support everything we're doing from a promotional and/or educational perspective. You can be in the right market and have the right product, but to be successful, you also need to have the right strategy and the right team to execute.

24. In response to an inquiry regarding the structure of the CRG Loan and management's confidence in being able to reach the required milestones, Defendant Jacob stated that "we're very comfortable we'll be able to meet all of the commitments."

25. On November 14, 2017, Defendants revealed that the CRG Loan, by its terms requiring the Company to meet minimal capital requirements, essentially forced Synergy to conduct a dilutive secondary equity offering to fund operations through 2019 and secure the second $100 million tranche of the CRG Loan.

26. On that date, Synergy conducted a secondary offering of approximately 22 million shares at $2.58 per share with warrants to purchase shares in future at the price of $2.86 per share, for net proceeds of $52.4 million. Following this news, the share price suffered an immediate 10% drop due to the dilution in equity and continued to trade downward the following day, trading as low as $1.68 per share on November 15, 2017.

27. On November 9, 2017, Synergy filed its Form 10-Q with the SEC, announced its financial results and provided a business update for the third quarter of 2017 ended September 30, 2017. In connection with the results, Defendant Jacob stated that "[w]e remain very excited by continued momentum for TRULANCE® in the CIC market." Further, Defendant Jacob added that "[t]he investments we've made and continued execution of our commercial strategy have allowed us to drive strong early customer demand, gaining TRULANCE coverage on major commercial, Medicare Part D and Medicaid plans within the first six months of launch."

28. On that same date, in connection with its financial results, the Company hosted a conference call during which Defendants elaborated on these thoughts. Specifically, during the call, Defendant Jacob stated:

> We remain very excited by TRULANCE's continued positive momentum in the CIC market, highlighted by total prescription volume growth of 105% quarter-over-quarter and net revenue growth of 117% over the prior quarter.
>
> This strong early demand and enthusiasm among healthcare providers and patients for TRULANCE has enabled us to gain coverage on major commercial Medicare Part D and Medicaid plans across the U.S. within the first six months of launch.
>
> * * *
>
> With growing customer demand, improved market access and the expected expansion into IBS-C, we have a significant opportunity to drive further growth and long-term value for patients, healthcare providers and our own shareholders.

29. During the conference call, Defendant Hamilton discussed the Company's purported progress:

> It's been a little more than seven months since we've launched with our first indication. And early prescription data along with healthcare professional and patient feedback is promising and very encouraging.
>
> * * *

> Our TRULANCE monthly total prescription volume has increased over 98% on average month over month, and there was 105% total prescription growth in Q3 versus Q2.
>
> Looking at the graph on the left, TRULANCE was the only branded prescription product out of the three to show positive growth in September with the 9,164 total prescriptions, up about 4.5% over August.
>
> As most of you know, September was a challenging month for the overall market. So the fact that TRULANCE achieved this type of growth during that period where many saw a flattening or even decline in prescriptions is very encouraging.
>
> * * *
>
> Looking ahead, we will continue to execute our launch plans and leverage the solid foundation to further drive demand in CIC. And as we do that, there is an additional opportunity to broaden the base as we prepare to potentially launch with the second indication in IBS-C early next year. We strongly believe based on customer feedback and these positive early launch signals that TRULANCE has a significant opportunity to be a major player in this market for many years to come.
>
> So the bottom line, we are fortunate to be in this large, growing market. We have the product, the strategy and the team to ensure continued success.

30. Defendant Gemignani described the early results as "very encouraging" during the same conference call and added the following:

> The investments we've made and will continue to make are focused on maximizing patient access to TRULANCE and driving demand. Because of these investments, we've been able to demonstrate strong early demand for TRULANCE and achieve the major market access wins Troy just discussed.
>
> Turning now to total cash used in operating expenses, which was $59.3 million for the third quarter. As I mentioned during our business update call in September, we expect total operating cash burn for the second half of 2017 to be a similar range as we reported in the first half of 2017. We expect cash used to decline over time, primarily due to revenue growth from TRULANCE,

> further reduction in R&D activities, and disciplined expense management.

31. Furthermore, Defendant Gemignani stated the following with respect to the CRG Loan, in pertinent part:

> [W]e were able to execute on a debt financing of up to $300 million structured as a senior secured loan from CRG. We borrowed $100 million at the time of closing. This is an eight-year term loan, with maturity date of June 30, 2025, has an annual interest rate of 9.5%.
>
> The deal structure allows us to pay interest only on quarterly basis for the first five years, and we can elect to pick a portion of that interest for the first several quarters. This gives us flexibility to focus spend on the launch period and driving demand and growing revenue. This structure also provides us with access to multiple tranches of up to an additional $200 million in non-dilutive capital should we choose to draw upon it.
>
> Under the terms of the agreement, we have access to an additional $100 million on or before February 28, 2018, and up to two additional tranches of up to $50 million on or before March 29, 2019, subject to certain conditions.
>
> While I cannot comment on specific conditions required to access the additional tranches beyond what's publicly disclosed, I can tell you that we are confident in our ability to meet the conditions that will allow us to access to the additional capital if and when we need it.

32. On March 1, 2018, Synergy filed its Form 10-K with the SEC, announced its financial results and provided a business update for the full year and the three months ended December 31, 2017. In connection with the results, Defendant Hamilton stated that Synergy experienced "impressive early adoption and uptake in our first few quarters as a commercial organization and resulted in solid operating results for 2017." Defendant Hamilton also highlighted "[s]trong customer demand was recognized by payors with TRULANCE coverage more than doubling its access on the largest commercial plans since launch."

33. Defendant Hamilton also revealed that the CRG Loan was amended on February 26, 2018 in two material ways: (i) future borrowings of $25 million on or before June 30, 2018, $25 million on or before September 30, 2018, and $50 million on or before December 31, 2018; and (ii) reduction in the total amount of commitment from $300 million to $200 million with minimum market capitalization requirement revised from $300 million to 200% of the outstanding principal amount of the loan.

34. On the same day, Synergy hosted a conference call to discuss the financial results and business update. Therein, Defendant Hamilton stated the following:

> The strong results we reported today and in our first few quarters as a commercial organization reflect the team's success in executing on key initiatives that support our mission. These key initiatives or business priorities, which we will discuss a little bit later, include optimizing our high-value asset, TRULANCE, ensuring a strong financial foundation, and continuing to evaluate all opportunities that allow us to achieve or help achieve our commercial and corporate objectives.
>
> * * *
>
> 2017 was marked by solid execution on many, many fronts. We started the year with the FDA approval and launch, of course, of our first product, TRULANCE, for the treatment of adults with CIC. Following our launch in late March, we continued to drive strong customer demand with total prescription volume growing 70% on average month-over-month through the end of 2017, and we met or exceeded all of our primary launch objectives with our key customers, the healthcare providers, patients and payers.

35. Additionally, Defendant Gemignani explained that the "2017 fourth quarter and full-year operating results demonstrate our ability to effectively manage expenses while still driving top-line growth. While we're not providing sales guidance at this stage, we remain encouraged by the initial sales trajectory of TRULANCE."

36. On May 10, 2018, Synergy filed its Form 10-Q with the SEC, announced its financial results and provided a business update for the first quarter of 2018 and the three months ended March 31, 2018. In connection with the results, the Company issued a press release in

which Defendant Hamilton stated: "[w]ith TRULANCE, we saw continued growth in prescriptions, market share and its prescriber base and with the IBS-C launch in late February, we have the opportunity to continue to drive further sales growth." Further, Defendant Hamilton was quoted as saying: "[i]n addition we continued to efficiently manage our operating expenses by prioritizing key investments in areas of high return, such as expanding market access."

37. On the same day, Synergy hosted a conference call in connection with the Company's earnings. During the call, Defendant Hamilton stated: "Our management team, along with our Board and advisors, will focus on identifying, evaluating and executing strategic opportunities that have the potential to maximize near and long-term shareholder value." Further, Defendant Hamilton also made the following statements:

> "For the first quarter, net sales were up 18% versus adjusted net sales for Q1 2017 and we saw continued growth in prescription, market share and prescriber base during Q1 versus the prior quarter, all this despite challenging headwinds from factors such as deductibles being reset by payers at the beginning of the year."
>
> * * *
>
> "Despite these challenges, the team battled back through January and February and in March, we bounced back and achieved our highest monthly prescription volume since launch with over 17,000 normalized total prescriptions. And again, it is also worth highlighting that we started promoting the IBS-C indication in late February with our sales force which we expect will continue to drive our uptake in the coming months."

38. Additionally, Defendant Gemignani stated that "we are forecasting to achieve a full year 2018 TRULANCE net sales in excess of the minimum revenue covenant of $61 million under the CRG debt agreement." Defendant Gemignani also added that the Company would be lowering its 2018 project total adjusted operating expenses to a range of $165 million to $175 million down from the previously guided $175 million to $185 million.

39. During the call, analyst Timothy Chiang of BTIG asked about whether the Company was restricted by the CRG Loan in its search for strategic alternatives. Defendant Gemignani offered the following reply:

> "Yeah, I would say we obviously have to look at – the answer is there probably always – there always is. The good news is we believe our relationship with CRG, I think as was reflected in the way we're able to amend the agreement to help meet our – what our needs were which is to allow us to flexibly and efficiently have access to capital as we look at all of these different options, we view CRG as a partner. They've been very collaborative in all the things we're trying to do as the types of options we're looking at that Troy mentioned. So we're very much aware and involved and will be support if it makes sense for obviously for the business, for them and our shareholders."

40. On August 8, 2018, Synergy filed its Form 10-Q with the SEC, announced its financial results and provided a business update for the second quarter of 2018 and the three months ended June 30, 2018. In connection with the results, the Company issued a press release, in which Defendant Hamilton was quoted as stating: "The Synergy team continues to demonstrate strong execution towards our 2018 key business priorities of optimizing the value of TRULANCE, ensuring a strong financial foundation and continuing to explore all business development opportunities[.] In terms of optimizing TRULANCE, we reported strong quarter-over-quarter growth with net sales increasing 43% in the second quarter."

41. Additionally, Defendant Gemignani represented that "[w]e are pleased solid topline growth of over 40% in the second quarter versus the prior quarter, resulting in $20.8 million in total net sales for the six months ended June 30, 2018[.] As we move into the second half of the year, we will continue to balance our commitment to topline growth with the efficient management of our bottom line, as highlighted by the 44% reduction in total adjusted operating expenses we achieved year-over-year."

42. Further, in the press release, Synergy stated its intention to update the ongoing strategic review, including any anticipated related impact on operating expenses, in the third quarter of 2018.

43. On August 28, 2018, Synergy announced Amendment No. 2 to the CRG Loan ("Amendment No. 2"). Pursuant to Amendment No. 2, the respective dates of the three subtranches that comprise the second tranche borrowing of $100 million were extended such that (i) the first subtranche of $25.0 million may occur after June 30, 2018 through and including October 31, 2018 provided the Company pays to the Administrative Agent a fee of $2.5 million at the time of borrowing and (ii) the second and third subtranches of $25.0 million and $50.0 million, respectively, may be made no later than December 31, 2018 and February 28, 2019, respectively. Additionally, CRG was granted the right to have a designated representative attend all meetings of the Company's Board in a non-voting observer capacity and to receive copies of all materials provided to the Board except for those presenting a conflict or necessary to preserve attorney-client or work product privileges.

44. On September 21, 2018, the Company announced the departure of its Chief Strategy Officer Marino Garcia. Pursuant to the separation agreement, Garcia was slated to receive a severance payment of $400,000. Further, Synergy explained that the leadership change would not impact on the Company's then-ongoing strategic review.

45. The statements referenced in ¶¶ 20-44 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) TRULANCE was underperforming and Synergy's revenues were insufficient to meet the minimum revenue requirements in the CRG Loan; (ii) due to operating expenses and lack of revenues, Synergy was unlikely to meet the capital requirements in the CRG Loan; (iii) due to the Company's lack of revenues and capital

deficiency, Synergy was unlikely to have sufficient market capitalization to satisfy the minimum market capitalization requirements in the CRG Loan; (iv) the Company's relationship with CRG was not "very collaborative" and CRG was unwilling to materially amend the CRG Loan to allow Synergy to become compliant based on its actual revenues; (v) the Company's strategic review had proven unsuccessful, no "white knight" or financing alternative had emerged to save the Company; and (vi) as a result of the foregoing, Synergy's public statement were materially false and misleading at all relevant times.

**The Truth Emerges**

46. On October 25, 2018, Synergy issued a press release, filed on Form 8-K with the SEC, providing a business update. According to the press release, Defendants stated that the Company's strategic review process failed to yield offers other than those that were significantly below the Company's current market value and similarly failed to yield any partnership opportunities. Further, Defendants explained that the Company did not anticipate receiving any significantly higher offers than those received to date.

47. Defendants also revealed that Synergy once again attempted to renegotiate the CRG Loan in conjunction with the strategic review process. Synergy stated, however, that those efforts to further amend the agreement with respect to financial and revenue covenants had been similarly unsuccessful. Additionally, Synergy revealed that it may not be able to satisfy the minimum liquidity covenant in the term loan agreement or secure alternative financing that better aligns with the Company's business interests. As a result, the Company revealed that it may be forced to default on the term loan agreement.

48. With respect to TRULANCE, Defendants admitted that the uptake in 2018 was slower than anticipated due to a highly competitive market access environment and slower than anticipated overall market growth. As a result, the Company was projecting total net sales of TRUALNCE for 2018 to be between $42 and $47 million, significantly below the minimum revenue covenant of $61 million as set forth in the term loan agreement, which Defendants had

represented that they were confident that Synergy would meet. Synergy also disclosed that if TRULANCE sales failed to meet that threshold, the Company would be subject to prepayment penalties equal to $38 million to $51 million.

49. On this news, Synergy's stock price collapsed from a close of $1.40 per share on October 25, 2018 to $0.43 per share on October 26, 2018.

**Post-Class Period Events**

50. After the close of the Class Period, on December 12, 2018, Synergy announced that it voluntarily filed for Chapter 11 bankruptcy with Bausch Health Cos. ("Bausch") acting as "stalking horse" bidder absorbing most of the Company's assets. The acquisition of Synergy's assets will be part of a deal valued at roughly $200 million.

51. On January 4, 2019, Synergy won court permission to move forward with a proposed sale of assets to Bausch, however, bidders would have until February 23, 2019 to make a competing bid.

## LOSS CAUSATION/ECONOMIC LOSS

52. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated prices of Synergy securities and operated as a fraud or deceit on Class Period purchasers of Synergy securities, including by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Synergy securities declined as the prior artificial inflation deflated from the stock price.

53. As a result of their purchases of Synergy securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The Defendants' false and misleading statements had the intended effect and caused Synergy securities to trade at artificially inflated levels throughout the Class Period.

54. By failing to disclose to investors the adverse facts detailed herein, the Defendants presented a misleading picture of Synergy's business and prospects. When the truth about the Company was revealed to the market, the price of Synergy's stock declined precipitously, removing the inflation from the stock price and causing the economic loss to investors who purchased Synergy securities during the Class Period.

55. The decline in the price of Synergy securities was a direct result of the nature and extent of the Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Synergy's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Synergy securities and the subsequent significant decline in the value of Synergy securities and when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

56. At all relevant times, the market for Synergy securities was an efficient market for the following reasons, among others:

a) As a regulated issuer, Synergy filed periodic public reports with the SEC; and

b) Synergy regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

57. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a) Defendants made public misrepresentations and/or failed to disclose material facts during the Class Period;

b) The misrepresentations and omissions were material;

c) The Company's stock traded in an efficient market;

d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

e) Plaintiff and other members of the Class purchased Synergy common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

58. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO STATUTORY SAFE HARBOR

59. The statutory safe harbor provided for forward-looking statements (under certain circumstances) does not apply to any of the materially false and misleading statements and omissions alleged herein. The statements alleged to be materially false and misleading relate to then-existing facts and conditions. Additionally, none of the statements alleged herein were adequately identified as "forward-looking statements" when made. Nor did meaningful cautionary language identify important factors that could cause actual results to differ materially from those stated.

## CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Synergy publicly traded securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are the Company, Defendants and their immediate families, the officers

and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

61. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Synergy stock was actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Synergy or its transfer agent and may be notified of the pendency of this action electronically, or by mail, using the form of notice similar to that customarily used in securities class actions.

62. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

63. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

64. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) Whether the statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Synergy;

c) Whether the prices of Synergy securities were artificially inflated during the Class Period; and

d) To what extent the members of the Class have sustained damages and the proper measure of damages.

65. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against the Defendants

66. Plaintiff incorporates ¶¶1-65 by reference.

67. During the Class Period, Defendants disseminated or approved the false statements specified above in ¶¶20-44, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a) Employed devices, scheme and artifices to defraud;

b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connected with their purchases of Synergy securities during the Class Period.

69. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Synergy securities and suffered losses when the relevant truth was disclosed. Plaintiff and the Class would not have purchased Synergy securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

**<u>COUNT II</u>**

**For Violation of §20(a) of the 1934 Act against the Defendants**

70. Plaintiff incorporates ¶¶1-69 by reference.

71. The Individual Defendants acted as controlling persons of Synergy within the meaning of §20(a) of the 1934 Act. By reason of their positions within the Company, and their ownership of Synergy securities, the Individual Defendants had the power and authority to cause Synergy to engage in the wrongful conduct complained of herein. By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: February 11, 2019

**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**

/S/ Matthew M. Guiney, Esq.
Matthew M. Guiney, Esq.
Patrick Donovan, Esq.

270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-686-0114
guiney@whafh.com
donovan@whafh.com

*Counsel for Plaintiff*